IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ROME DIVISION

UNITED STATES OF AMERICA )
)
vs. )          CRIMINAL ACTION
)          FILE NO. 4:22-CR-018-SDG-WEJ
ROBERTO RODRIGUEZ-SOTO )

## MOTION TO DISMISS FOR INDICTMENT FOR VIOLATION OF EQUAL PROTECTION

COMES NOW the Defendant, ROBERTO RODRIGUEZ-SOTO, by and

through undersigned counsel, and files this motion to dismiss indictment for

violation of equal protection under the Fifth Amendment due process clause.  This

motion is the perfected version of Mr. Rodriguez-Soto's motion to dismiss for

violation of  equal protection, doc. 19.  In support thereof, Mr. Rodriguez-Soto states

the following.

## Introduction

In April 2020, the Supreme Court relied on historical evidence of a state

legislature's racial motives to strike down a criminal law enacted a century earlier.

*See Ramos v. Louisiana*, 140 S. Ct. 1390 (2020).  Although the law had been later

reenacted with no evidence of animus, the Court refused to ignore the "racially

discriminatory reasons that [the state had] adopted [its] peculiar rules in the first

1

place." *Id*. at 1401 (emphasis in original).  Even the justices' "shared respect for rational and civil discourse" could not "supply an excuse for leaving an uncomfortable past unexamined." *Id*. at 1401 n.44.

Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted based upon a white supremacist belief that the "Mexican race"[1] would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons."[2]  They claimed Mexicans were "poisoning the American citizen."[3]  They sought to keep the country's blood "white and purely Caucasian."[4]  They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[5]  Not only did this racism underlie the original version of §

---

[1] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality.  For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census. gov/history/www/through_the_decades/index_of_questions/1930_1.html.  And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).

[2] *See infra* at 8, 10, 11, 12m 13, 17.
[3] *See infra* at 15, 17.
[4] *See infra* at 13.
[5] *See infra* at 13-14.

1326, the law has disparately impacted Mexicans and other Latino individuals in the century since.

Because the facts and historical evidence presented here show that the original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact, § 1326 is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  The burden thus shifts to the government to show that Congress would have passed the 1929 law in the absence of any discriminatory purpose.  If the government cannot make this showing, the law is invalid, and the Court must dismiss Mr. Rodriguez-Soto's criminal charge.

At a minimum, if the Court believes Mr. Rodriguez-Soto has not shown a discriminatory purpose and a disparate impact, it should hold an evidentiary hearing. The Court should also schedule an evidentiary hearing if the government submits evidence that the Court believes may be sufficient to rebut Mr. Rodriguez-Soto's evidence.  But if the government does not attempt to rebut his evidence, or cannot do so, the Court should dismiss the indictment.

## Argument

### Legal framework: the *Arlington Heights* test.

The Fifth Amendment of the Constitution provides that no person shall be

3

"deprived of life, liberty, or property, without due process of law." U.S. Const.,

Amend. V.  This clause contains an implicit guarantee of equal protection in federal

laws identical to what the Fourteenth Amendment guarantees in state laws. *See*

*Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).  A law may violate

equal protection in three ways.  First, a law may discriminate on its face. *See*, *e.g.*,

*Loving v. Virginia*, 388 U.S. 1 (1967).  Second, authorities may apply a facially

neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356

(1886).  Third, a legislature may enact a facially neutral law with a discriminatory

purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*,

429 U.S. at 265–68.

     Here, Mr. Rodriguez-Soto challenges § 1326 under the third rationale.  So, the

legal framework of *Arlington Heights* applies.  *Arlington Heights* clarified that the

*effect* of a racially discriminatory law does not alone make it unconstitutional.  The

touchstone of unconstitutionality is the existence of discriminatory purpose or

discriminatory intent for the enactment of the law.  *Id*. at 265; *see also Abbott v.*

*Perez*, 138 S.Ct. 2305, 2346 (2018).  Determining whether a purpose was

discriminatory requires "a sensitive inquiry into such circumstantial and direct

evidence of intent as may be available." *Id*. at 266.  *Arlington Heights* gave a non-

exhaustive list of relevant factors to consider in this determination, including:

1)   the impact of the official action and whether it bears more
     heavily on one race than another;

2)   the historical background of the decision;

3)   the specific sequence of events leading to the challenged action;

4)   the [legislature's] departures from normal procedures or
     substantive conclusions; and

5)   the relevant legislative or administrative history.

*Arce v. Douglas*, 793 F.3d 968, 977 (9th Cir. 2015) (citing *Arlington Heights*, 429
U.S. at 266–68).

The threshold for satisfying these factors is low. Since legislatures are rarely
"motivated solely by a single concern," a challenger need not show that the
legislature's actions "rested solely on racially discriminatory purposes." *Arlington
Heights*, 429 U.S. at 265–66. Instead, the challenger need only show "proof that a
discriminatory purpose has been a *motivating factor* in the decision." *Id.* at 265–66
(emphasis added). *See also Arce*, 793 F.3d at 977 (quoting *Arlington Heights* to hold
that a challenger need not prove discrimination was the "sole purpose" of the
challenged action – only that it was a "motivating factor").

Once the challenger shows that discriminatory purpose was a "motivating
factor," the burden shifts to the law's defender to show that "the same decision

would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.

Courts have applied *Arlington Heights* to a variety of laws and government actions. One of the first involved a provision in the Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Hunter*, 471 U.S. at 222. Though neutral on its face, the provision disenfranchised ten times as many Blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id*. at 229–31. The Supreme Court concluded that the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation."

6

*Id*. at 231.  Moreover, the provision had a continuing disparate impact on Black persons. *Id*. at 233.  Thus, the Supreme Court held that it violated equal protection. *Id*.

In 2015, the Ninth Circuit applied *Arlington Heights* in a challenge to an Arizona law shutting down a Mexican-American Studies program in the Tucson school district. *See Arce v. Douglas*, 793 F.3d at 981.  During the law's passage, legislators had accused the program of inciting "racial warfare" and supporting a group purportedly claiming that "North America is a land for the bronze peoples." *Id*. at 978.  Finding that such comments created a genuine issue of material fact as to whether the law was "motivated, at least in part, by an intent to discriminate against [Mexican-American Studies] students," the Ninth Circuit reversed the district court's grant of summary judgment and remanded for a full trial. *Id.* at 981.

In a recent decision, the Chief Judge of the District of Nevada agreed with the very arguments that Mr. Rodriguez-Soto advances here and found that § 1326 was unconstitutional due to the pervasive racial animus that had motivated both its original passage in 1929 and its re-enactment in 1952. *United States v.  Carrillo-Lopez*, ___ F. Supp. 3d ___, 2021 WL 3667330 (D. Nev. Aug. 18, 2021) (attached as Exhibit L).  The *Carrillo-Lopez* court applied the *Arlington Heights* framework and concluded both that the law had been passed with a discriminatory purpose and

that it continues to disparately impact Mexican and other Latino people. *Id*. at *25. While a number of court decisions since *Carrillo-Lopez* have not followed *Carrillo-Lopez*, *e.g., United States v. Ramirez-Mendoza*, Unpublished, 2022 WL 2714965 (N.D. Ga. July 13, 2022), Mr. Rodriguez-Soto posits that *Carrillo-Lopez* was correctly decided on the constitutionality of 8 U.S.C. § 1326.

*Hunter*, *Arce*, and *Carrillo-Lopez* show that courts have used *Arlington Heights* for decades to invalidate facially neutral laws enacted with a discriminatory intent that have disparately impacted racial groups.[6] As Mr. Rodriguez-Soto will show, the same animus infected § 1326 to an equal (or even greater) degree.

Courts apply strict scrutiny to the question of whether a law was "motivated by a racial purpose or object" under *Arlington Heights. See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (quotations omitted). In *United States v. Osorto*, 995 F.3d 801 (11th Cir. 2021), the Eleventh Circuit Court of Appeals applied rational basis analysis to an equal protection raised with respect to United States Sentencing Guideline § 2L1.2, which applies to illegal re-entry offenses. *Osorto* is distinguishable from the instant case.

In *Osorto*, the defendant argued that the criminal history enhancements in

---

[6]

United States Sentencing Guideline § 2L1.2 violate equal protection because they subject non-citizens to offense level enhancements based upon criminal history in addition to the enhancements to criminal history category, which also apply to citizens. 995 F.3d at 808, 810.  The Eleventh Circuit held that rational-basis scrutiny applied, because "the federal government enjoys the exclusive authority to control immigration and to regulate the relationship between the United States and noncitizen visitors here." *Id*. at 810-811.  The Eleventh Circuit held that the offense level enhancements in U.S.S.G. §§ 2L1.1(b)(2) and (b)(3) bear a rational relationship to the interests Congress relied upon – ensuring that sentences reflect relative degrees of culpability and risks of recidivism.  Thus, the Eleventh Circuit held that §§ 2L1.1(b)(2) and (b)(3) do not violate equal protection.

*Osorto* did not involve evidence of a racially discriminatory purpose underlying the Guidelines provisions that were being challenged.  In this case, however, historical evidence shows that § 1326 was enacted to target particular non-citizens based on their race.  As the District Court for Nevada observed in *Carrillo-Lopez*, "The federal government's plenary power over immigration does not give it license to enact racially discriminatory statutes in violation of equal protection." 2021 WL 3667330, *2; *see also Regents of the Univ. of Cal. v. U.S. Dept. of Homeland Security*, 908 F.3d 476, 518-20 (9th Cir. 2018) (applying *Arlington*

9

*Heights* framework to assessing whether petitioners had stated a plausible claim that DACA recission violated equal protection), *rev'd in part, vacated in part sub nom Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1915-16 (2020) (plurality of Supreme Court holding that standards of *Arlington Heights* would have to be met for equal protection challenge against DACA recission); *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (applying *Arlington Heights* strict scrutiny instead of rational basis analysis to termination of Temporary Protected Status designations for Sudan, Nicaragua, Haiti and El Salvador).

As a general matter, the plenary power of the President and Congress over Immigration is entitled to less deference when the subject of the challenged governmental action is present in the United States.  In *Ramos*, the Ninth Circuit noted:

> As the Supreme Court has recognized, "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). Accordingly, the level of deference that courts owe to the President in his executive decision to exclude foreign nationals who have not yet entered the United States may be greater than the deference to an agency in its administration of a humanitarian relief program established by Congress for foreign nationals who have lawfully resided in the United States for some time.

975 F.3d at 896.  Mr. Rodriguez-Soto legally immigrated to the United States from

Mexico with his family when he was two years old.  Mr. Rodriguez-Soto is now thirty years old.  He was twenty-three when he was first removed from the United States.

Finally, "greater protections under the Fifth Amendment necessarily apply when the government seeks to 'punish by deprivation of liberty and property.'" *Carrillo-Lopez*, 2021 WL 3667330, *2 (citing *Wong Wing v. United States*, 163 U.S. 228, 237 (1896)).  Section 1326 imposes criminal punishment in the form of imprisonment.  The deprivation of liberty naturally invokes a heightened degree of judicial scrutiny for equal protection.

**B.     Congress enacted illegal reentry with a discriminatory purpose: under the *Arlington Heights* factors, racism and eugenics were a motivating factor" in the passage of illegal reentry laws.**

While not "purporting to be exhaustive," the five *Arlington Heights* factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268.  Review under the *Arlington Heights* framework shows that § 1326 violates equal protection.  As recent Supreme Court precedent confirms, courts must consider historical evidence concerning the intent behind enactment of a statute in determining the statute's constitutionality.  A close examination of the political context underlying the criminalization of illegal entry in

1929 reveals a disturbing truth: that racism and eugenics were not only a "motivating factor" in the legislature's passage of this law. *See Arlington Heights*, 429 U.S. at 265. They were the *primary* factor.

### 1. "The historical background of the decision."

Historians often refer to the 1920s as the "Tribal Twenties"—a time when the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit A, Declaration of Dr. Kelly Lytle Hernández, Professor of History at the University of California, Los Angeles, at 2.[7] World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction."[8] Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[9] and "the 'contamination' of Anglo-American society."[10] The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[11] Many politicians, especially those

---

[7] Exhibits A through K, including the Declaration of Dr. Kelly Lytle Hernandez, are part of the record for the *Carrillo-Lopez*, *supra*. The District Court of Nevada Docket No. is 3:20-CR-00026-MMD-WGC.

[8] Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).

[9] *Id*. at 223.

[10] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).

[11] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out*

popularly known as "nativists," hoped to "restrict and even end immigration to the United States from every region of the world other than western Europe." Exhibit A, Hernández declaration, at 2. At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.[12] During the remainder of the decade, legislators aimed for "America [to] cease to be the 'melting pot.'"[13]

Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[14] These fears of non-white immigration were bolstered by the growing acceptance of eugenics – a theory that "captured the imagination of many of America's leading intellectuals."[15] The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[16] The leader of a major scientific institution contended that neither education nor environment could alter the

---

*of America* (2019).
[12] Emergency Immigration Act of 1921, Pub. L. 67-5, 42 Stat. 5 (1921).
[13] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed).
[14] Hernández, *supra*, at 28.
[15] Yang, *supra*, at 35.
[16] *Id*. at 8.

"'profound and inborn racial differences' that rendered certain people inferior."[17]
And states throughout the country were drafting laws "based on this burgeoning race
science, including aggressive sterilization programs."[18]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the
director of the Eugenics Record Office.[19] Dr. Laughlin was well known for his
model sterilization law that many states and countries, including the Third Reich of
Nazi Germany, used as a template.[20] During the 1920s, Dr. Laughlin testified before
Congress multiple times and produced four reports that discussed topics such as
"race crossing," "mate selection," "fecundity," "racial composition," and the
"individual quality of future population." Exhibit B, *The Eugenical Aspects of
Deportation: Hearings before the Committee on Immigration and Naturalization
House of Representative*, 70th Cong. 70.1.4 , pp. 2, 3 (1928).  Relying heavily on
these theories, Congress would anchor its immigration legislation in eugenics and
racial inferiority for the remainder of the decade.[21]

---

[17] Okrent, *supra*, at 3.
[18] *Id*. at 38.  Those sterilization laws were affirmed in the now infamous decision
*Buck v. Bell*, 274 U.S. 200, 207 (1927).
[19] Ngai, *supra*, at 24.
[20] *Harry Laughlin and Eugenics*, Truman State University.  Accessible at
https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.
[21] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-
1965*, 212-13 (1981).

**2.** <u>"The specific sequence of events leading to the challenged action."</u>

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants, which was often code for non-white. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 505–06 (9th Cir. 2016) (holding that "the use of 'code words' may demonstrate discriminatory intent"). The first such law was the National Origins Act of 1924, which established quotas based on the national origins of U.S. citizens as reflected in the 1890 census.

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly Anglo-Saxon.[22] The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established. Indeed, its newly-created "Quota Board" interpreted this provision to exclude all Black people, all East and South Asians (including those who had American citizenship by birth), and all citizens in Hawaii, Puerto Rico, and Alaska.[23] Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[24]

Yet there was a wrinkle in the National Origins Act – it did not set quotas on

---

[22] Ngai, *supra*, at 24-25.
[23] *Id*. at 26.
[24] *Id*. at 35.

immigrants from countries in the Western Hemisphere.  This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.[25]  These agri-businesses pressured legislators from western states to vote against the law, forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all." Exhibit A, Hernández declaration, at 3.  As one representative complained, there was no chance of capping the number of Mexican immigrants because too many growers were "interested in the importation of these poor peons." Exhibit C, Representative Box (TX). "Deportation of Aliens." *Congressional Record*, (Feb. 16, 1929) p. H3619.

So, despite passing the most sweeping immigration law in years, legislators were not happy.  Representative Madden grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States – the Mexican peon."[26]  Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel." Exhibit D, Representative O'Sullivan, "Administration of the Law." *Congressional Record* 65:6 (1924) p. H5900.  Legislators "proposed bill after bill" restricting Mexican immigration but

---

[25] See Hans P. Vought, *The Bully Pulpit*, 179 (2004).
[26] Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).

none could survive opposition from southwestern growers. Exhibit A, Hernández declaration, at 5.  To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal rather than a civil angle.

### 3. "The relevant legislative or administrative history."

After passage of the National Origins Act of 1924, the Department of Labor (which governed the Bureau of Immigration) began implementing Congress's new quota system.[27] Then-Secretary of Labor James Davis was a strong advocate of Dr. Laughlin and his eugenics theories – even using them as the basis for policies he had developed and published under the title "Selective Immigration or None."[28]  Davis warned that the "rat type" was coming to the United States, and that these "rat men" would jeopardize the American gene pool.[29]

Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries.[30] So, together with devout racist (and suspected Ku Klux Klan member)

---

[27] *See* Vought, *supra*, at 174-79.
[28] *Id.*
[29] *Id.* at 174-75.
[30] *Id.* at 216.

Senator Coleman Blease,[31] Davis developed a compromise – Congress would criminalize border crossing *after the fact*, rather than *prevent* it in the first place.[32] That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor.[33]   The southwest growers were in agreement – as one put it, "We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country." Exhibit A, Hernández declaration, at 7.

Secretary Davis and Senator Blease found two eager collaborators in the House of Representatives, both of whom were on the powerful Immigration and Naturalization Committee.   Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." Exhibit E, Representative Box (TX). "Restriction of Mexican Immigration," *Congressional*

---

[31] For biographical and historical context about Senator Blease, *see* B. Simon, *The Appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57-86 (Feb. 1996), available at http://www.jstor.com/stable/2211206.

[32] Ian MacDouglass, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

[33] *Id.*

*Record*, (Feb. 9, 1928) pp. H2817–18.  In one speech at an immigration conference,

Rep. Box had explained:

> The Mexican peon is a mixture of Mediterranean-blooded Spanish
> peasant with low-grade Indians who did not fight to extinction but
> submitted and multiplied as serfs.  Into that was fused much negro slave
> blood….The prevention of such mongrelization and the degradation it
> causes is one of the purposes of our [immigration] laws.

*Id*.  Box believed this importation was "raising a serious race question" because

Mexicans were "essentially different from us in character, in social position."

Exhibit C at H3619.

Box was joined by the influential Chairman of the House Immigration and

Naturalization Committee, Representative Albert Johnson of Washington.  Chairman

Johnson – for whom the 1924 "Johnson-Reed" National Origins Act was named –

was an "energetic and vehement racist and nativist."[34]  He headed the Eugenics

Research Association, a group that opposed interracial marriage and supported

forced sterilizations.[35]  He also proudly described his 1924 law as a "bulwark against

'a stream of alien blood, with all its inherited misconceptions respecting the

relationships of the governing power to the governed."[36]   Within two years of the

---

[34] Dennis Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242-43 (2002).
[35] *Id*.
[36] Roger Daniels, *Guarding the Golden Door*, p. 55 (Hill and Wang, 2004).

1924 Act, Chairman Johnson turned to legislation that would exclude the "Mexican race," explaining that while the argument for immigration restriction had previously been economic, now "'the fundamental reason for it is biological.'"[37]

Following the lead of these legislators, other lawmakers soon "turned to narratives of racial threat to justify restriction."[38]  In 1928, for instance, Representative Robert A. Green of Florida delivered a radio speech (later read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas.  He asserted that countries south of the United States are "composed of mixture blood of White, Indian, and negro." Exhibit F, Representative Lankford. "Across the Borders." *Congressional Record* (Feb. 3, 1928) p. H2462. Immigration from these countries, he believed, created a "very great penalty upon the society which assimilates," and put it at a disadvantage to countries that have "kept their blood white and purely Caucasian." Exhibit F, at H2462.

Chairman Johnson soon convened hearings on new immigration legislation. *See* Exhibit G, *Hearings Before the Committee on Immigration and Naturalization*, 69th Cong. 69.1.3 (1926).  At the first hearing, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out

---

[37] Okrent, *supra*, at 3.
[38] Gonzalez O'Brien, *supra*, at Chap. 1 (Kindle edition).

"the scoff and scum, the mongrel, the bootlegger element, from Mexico." Exhibit G, at 29-30. In response to Chairman Johnson describing a portion of the letter, Commissioner General of Immigration Harry Hull, stated, "I think he is right." Exhibit G, at 29. Representative Box added, "I have some letters, Mr. Chairman, just like that." Exhibit G, at 29.

The following month, the same House committee held a hearing on "The Eugenical Aspects of Deportation," where the principal witness was the well-known eugenicist Dr. Laughlin. Exhibit B, at 1. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a "priceless" resource that would "bear intimately on immigration policy." Exhibit B, at 3.

Dr. Laughlin testified about his latest eugenics report, the goal of which was to "protect American blood from alien contamination." Exhibit B, at 3. When Dr. Laughlin encouraged the committee to conduct future research on the effect of "race crossing within the United States," Chairman Johnson replied that such a study would "be of great use to the committee in its deliberations." Exhibit B, at 11.

Dr. Laughlin discussed the need for further research into "mate selection," because "whenever two races come in contact there is always race mixture" even though the "upper levels tend to maintain themselves because of the purity of the

women of the upper classes." Exhibit B, at 19.  The job of any government, Dr.

Laughlin explained, was to "demand fit mating and high fertility from the classes

who are better endowed physically, mentally, and morally by heredity." Exhibit B, at

19.  By deporting or excluding the "lower races" from the country, Dr. Laughlin

contended, "[i]mmigration control is the greatest instrument which the Federal

Government can use in promoting race conservation of the Nation." Exhibit B, at 19.

In response, Chairman Johnson advocated for Congress's use of the "principle

of applied eugenics" to "do everything possible" to reduce crime by "debarring and

deporting" more people. Exhibit B, at 25.  Representative Box agreed, stating, "we

will have to control immigration to suit our own needs or we will lose our national

character," which would "spell destruction for the future of America." Exhibit B, at

25.

Dr. Laughlin even compared the drafters of deportation laws to "successful

breeders of thoroughbred horses," who would never consider "acquiring a mare or a

stallion not of the top level" for their "stud farm." Exhibit B, at 44.  One such

successful breeder he knew "weeds out from the lower levels and recruits by

purchase" – a process that is "analogous to immigration in man." Exhibit B, at 44–

45.  "Man is an animal," Dr. Laughlin explained, "and so far as heredity and future

generations are concerned, there is considerable real basis for [this] comparison."

Exhibit B, at 45.

When such racial engineering is not possible, Dr. Laughlin warned, deportation of the "undesirable individual" becomes even more critical; otherwise, "we cannot get rid of his blood no matter how inferior it may be, because we cannot deport his offspring born here." Exhibit B, at 45.  Dr. Laughlin predicted that so long as the nation's borders remained open to immigrants, "there will always be need for deportation, or the 'final selection.'" Exhibit B, at 44.  In response to this testimony, Chairman Johnson agreed that "[i]mmigration looks more and more like a biological problem, and if the work of this committee results in establishing this principle in our immigration policy we will be well repaid for our efforts." Exhibit B, at 46.

Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough.  On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." Exhibit H, S. Rep. No. 1456, at 1 (1929).  This report was accompanied by a letter from Secretary Davis on behalf of the Department of Labor advocating for passage of the law. Exhibit H, at 2.

The following week, Senator Blease presented this bill on the Senate floor,

where he reported that Chairman Johnson had "asked me to get the measures over to the House [within two days] if I possibly could." Exhibit I, Senator Blease (SC). *Congressional Record* (Jan. 23, 1929) p. S2092.  The full Senate passed the bill with almost no discussion or debate. Exhibit I, at S2092.  Two weeks later, Chairman Johnson submitted a report from the Committee of Immigration and Naturalization to the full House recommending passage of the illegal reentry law. Exhibit J, S. Rep. No. 2397 (1929).

During debate on the bill, Representative Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." Exhibit C, Cong. Rec. 1929. Representative Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." Exhibit C, Representative Blanton, "Deportation of Aliens." *Congressional Record* (1929), at H3619.  Representative Schafer added that "[t]hese Mexicans also come into Wisconsin in droves," and Representative Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." Exhibit C, at H3619.  Representative Fitzgerald then added that from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that

is "very undesirable." Exhibit C, Rep. Fitzgerald, "Deportation of Aliens."
*Congressional Record* (1929), Exhibit C, at H3620.  Minutes later, the bill passed
the House of Representatives. Exhibit C, at H3621.  The president signed it into law
three days later. *See* Exhibit K, 70th Cong., Sess. II, Chap. 690, Mar. 4, 1929.

 This legislative history easily clears the low threshold of showing that racism
and eugenics were a "motivating factor" under the first three factors.  Like other
*Arlington Heights* cases, passage of the racially-motivated law followed a
predictable pattern.  A broad social movement founded on principles of white
supremacy and eugenics gained popular support in the 1920s. *Compare Hunter*, 471
U.S. at 229 (discussing "a movement that swept the post-Reconstruction South to
disenfranchise blacks").  Dr. Laughlin, a notorious eugenics "expert," promoted
theories of racial inferiority through multiple reports and testimony to Congress.
Key lawmakers like Chairman Johnson, Senator Blease, and Representative Box
(along with Secretary of Labor Davis) promoted these theories and repeatedly
endorsed them during legislative sessions. *Compare Arce*, 793 F.3d at 978–79
(legislator accused ethnic studies program of inciting "racial warfare," and state
actors expressed similar sentiments).  Congressmen who might not have otherwise
endorsed racially motivated legislation were consistently advised of the "inferiority"
of the "Mexican race" during legislative sessions in the five years leading up to the

25

law's passage.  The evidence of racial discrimination in the legislative history and events leading up to the passage of the 1929 law easily meets the requirement under *Arlington Heights* that race was found to be a "motivating factor" behind the passage of the legislation.

> **4.** <u>"The legislature's departures from normal procedures or substantive conclusions.</u>

Examining the fourth *Arlington Heights* factor – whether a decisionmaker departs from "normal procedures or substantive conclusions" – requires courts to consider any "procedural irregularities" leading up to the enactment of a law that could signal a discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013).  Courts may also consider illogical or counter-intuitive conclusions in the decision-making process. *See, e.g.*, *Ave. 6E Investments,* 818 F.3d at 507 (citing the city's decision to "disregard the zoning advice of its own experts").  Here, not only do the overtly racist statements of legislators during the law's passage show its discriminatory purpose, several irregularities and illogical conclusions in the passage of the 1929 law also implicate this factor.

First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation.  Both the

1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked belief

that immigration control was a matter of racial engineering, akin to horse breeding.

And while Congress ultimately acknowledged the discriminatory origins of the

National Origins Act of 1924 and repealed it in 1965,[39] illegal reentry remains one of

the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost

exclusively at Mexicans – even though Canadians were also entering the United

States in great number. *See* Exhibit C, at H3621 (the recorded number of Canadians

who entered the United States in 1928 was 81,506, whereas the total immigration

from Europe was 165,000).  If the 1929 Act was motivated by generalized

xenophobia or economic anxiety, rather than racism, one would expect legislators to

criticize foreigners across the board.  But no legislator referred to Canadians as

"mongrels"; none complained of "hordes" of Canadians crossing the border; none

objected that Canadians were "poisoning the American citizen."  And a

representative from Wisconsin complained only about *Mexicans* taking jobs, not

Canadians. *See* Exhibit C, at H3619.  These irregularities show that not only was

---

[39] *See* Immigration and Nationality Act of 1965, Pub. L. 89-236 (abolishing the
National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to
Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75
N.C. L. Rev. 273, 301 (1996) (noting Congress' "racial egalitarian motivation" for
repealing the National Origins Act).

Congress's passage of the Undesirable Aliens Act based on eugenics and racism, it also departed from typical substantive conclusions underlying immigration law.

     **5.** <u>"The impact of the official action and whether it bears more heavily on one race than another."</u>

Within a year of the 1929 law's passage, the government had prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[40] In each of these years, individuals from Mexico comprised no fewer than 84% of those convicted, and often made up as many as 99% of defendants.[41] And the number of prosecutions has greatly increased in recent years. In fiscal year 2020, there were 19,654 persons convicted of illegal re-entry, a 24.3 % increase since 2016.[42] Illegal reentry is one of the most common federal felonies today.[43]

In sum, applying the five *Arlington Heights* factors shows that racism and

---

[40] *Annual Report of the Attorney General of the United States for the Fiscal Year 1939*, 37; Kelly Lytle Hernandez, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, 1771-1965, n. 6 at 138-39 (UNC Press, 2017).
[41] Hernandez, *supra* n. 6, at 138-39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931-36).
[42] See United States Sentencing Commission, Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick facts/Illegal_Reentry_FY20.pdf.
[43] In Fiscal Year 2020, 64,565 cases were reported to the United States Sentencing Commission. United States Sentencing Commission, Quick Facts: Illegal Reentry Offenses, Fiscal Year 2020, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick facts/Illegal_Reentry_FY20.pdf.  23,759 of those were immigration offenses. *Id.* 82.7 % of immigration cases involved illegal re-entry. *Id.*

eugenics were, at minimum, a "motivating factor" in the passage of the Undesirable Aliens Act. And as new Supreme Court precedent confirms, courts should consider this historical evidence in determining whether a statute is constitutional.

### C. The 1952 enactment of § 1326 does not cleanse the taint of discriminatory intent from the 1929 statute.

Two recent Supreme Court cases show that a discriminatory purpose that fueled a law's original enactment can be relevant in determining its constitutionality, even with respect to fundamental rights analysis. *Ramos v. Louisiana*, *supra*, concerned the fundamental right to a jury trial, which has been incorporated through the Fourteenth Amendment as applicable to the states. 140 S.Ct. at 1397. *Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246 (2020), concerned a Montana legislative enactment challenged as violating the free exercise clause of the First Amendment.[44]

In *Ramos v. Louisiana*, the Court struck down a state law permitting convictions by non-unanimous juries, citing the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules in the first place." 140 S. Ct. at 1401 (emphasis in original). Although Justice Alito argued in his dissent that both states later recodified their non-unanimity rules with no mention of race, the majority rejected the notion that this cured the laws' original animus, holding that if courts

___

[44] "[T]he free exercise of religion is a fundamental constitutional right." *Johnson v. Robison*, 415 U.S. 361 n. 14 (1974).

must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." *Id*. at 1401 n. 44.  Nor could the justices' "shared respect for rational and civil discourse . . . supply an excuse for leaving an uncomfortable past unexamined." *Id.* (citation and quotations omitted).

Two months later, the Supreme Court struck down a Montana law that prohibited the use of certain scholarships at religious schools when the related, primary legislative provision provided tax credits for persons who funded those same scholarships for use at private schools. *See Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246 (2020).  The majority noted the "checkered tradition" of religious discrimination underlying laws disqualifying religious schools from government aid. 140 S.Ct. at 2258-2259.

Concurring, Justice Alito invoked his *Ramos* dissent, noting its argument that courts cannot examine impermissible motives underlying the original version of a law where states have "readopted their rules under different circumstances in later years." *Id*. at 2268 (quotations omitted).  Justice Alito then stated, "But I lost, and *Ramos* is now precedent." *Id*. Justice Alito then provided an extensive history of the anti-Catholic and anti-immigrant motives underlying no-aid provisions, including Montana's law. *Id.* at 2268-2274.  Justice Alito concluded that "[u]nder *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for

benign reasons. *Id.* at 2273.  The provision's 'uncomfortable past' must still be 'examined.'" *Id.* (quoting *Ramos*, 140 S. Ct., at 1396 n. 44).

Here, the original illegal reentry law codified in the Undesirable Aliens Act of 1929 has been reenacted several times, most notably in the Immigration and Nationality Act of 1952.[45] But *Ramos* and *Espinoza* show that courts should examine the discriminatory motivations underlying a law at the time of its passage and that the taint of discriminatory purpose is not necessarily cleansed by mere reenactment of the law.

The government may also argue that even if racism and eugenics were a "motivating factor" in § 1326's original passage, the law currently serves other legitimate purposes.  But laws enacted with a discriminatory purpose cannot be "cured" merely because they later satisfy a non-discriminatory purpose. *See Hunter*, 471 U.S. at 233 (rejecting Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement

---

[45] *See* June 27, 1952, c. 477, Title II, ch. 8, § 276, 66 Stat. 229; Pub.L. 100-690, Title VII, § 7345(a), Nov. 18, 1988, 102 Stat. 4471; Pub.L. 101-649, Title V, § 543(b)(3), Nov. 29, 1990, 104 Stat. 5059; Pub.L. 103-322, Title XIII, § 130001(b), Sept. 13, 1994, 108 Stat. 2023; Pub.L. 104-132, Title IV, §§ 401(c), 438(b), 441(a), Apr. 24, 1996, 110 Stat. 1267, 1276, 1279; Pub.L. 104-208, Div. C, Title III, §§ 305(b), 308(d)(4)(J), (e)(1)(K), (14)(A), 324(a), (b), Sept. 30, 1996, 110 Stat. 3009-606, 3009-618 to 3009-620, 3009-629.

provision).  Rather, when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id.*

## C. The Court should find that the 1952 enactment was also motivated by discriminatory intent.

Even if later reenactments of a discriminatory statute *could* cleanse that statute of its motivating racism, this Court should consider and adopt the factual findings of *United States v. Carrillo-Lopez*, ___ F.Supp.3d ___, 2021 WL 3667330 (D. Nev. Aug. 18. 2021).  In that case, the district court considered contemporaneous evidence from the passage of the 1952 enactment and found several plain indicia of an intent to discriminate against Mexican and other Latino people. *Id.* at * 10.

First, the district court noted the 1952 Congress had completely failed to debate or otherwise discuss the problematic origins of the re-entry statute, despite having debated these problems in other national origin statutes being considered around the same time. *Id.* at *11.  This silence, the district court found, indicated that Congress had either "ignored' the racial animus of the predecessor of the re-entry statute (and only of the re-entry statute), or had decided to adopt that animus. *Id.*

Second, the district court pointed out that President Truman had vetoed the

bill expressly because it "would perpetuate injustices of long standing against many other nations of the world," and because the bill would "continue, practically without change," the discriminatory practices of the 1924 and 1929 versions. *Id*. at *12 (citations omitted).  Accordingly, the district court found, Congress's decision to override that veto without commenting on the law's racist forebears "is evidence of at least indifference to the nativist motivations of the statute's predecessor." *Id*.

The district court noted that there was some evidence of racial animus associated with the 1952 re-enactment of § 1326.  For example, one government supporter of the bill did so with a racist slur.  The court found that then-Deputy Attorney General Peyton Ford had written a letter in 1951 in support of the bill to the Chairman of the Senate Judiciary Committee, Pat McCarran (D-Nev.), describing the bills targets as "wetbacks" and calling for the statute to be amended to allow immigrants to be prosecuted wherever they were found. *Id*. at *13 (citation omitted).[46]  The *Carrillo-Lopez* court also found that Congress nicknamed the bill the "Wetback Bill," and intended to "criminaliz[e] Mexican immigrant laborers while shielding employers" of those same laborers. *Id*. at *15.  Finally, the district court noted that, to this day, Congress has been aware that § 1326 disproportionately

---

[46] Deputy Attorney General Ford's request was the only substantive change Congress made to §1326 in 1952. *Carrillo-Lopez*, 2021 WL 3667330, *13.

affects Mexican and Latino people and has remained silent in the face of that
evidence. *Id.*

The *Carrillo-Lopez* court's decision is, of course, not binding on this Court.
However, Mr. Rodriguez-Soto urges this Court to examine the evidence upon which
that district court relied, and to adopt those findings in this case to rule that the 1952
enactment was also motivated by a discriminatory purpose.

**D.    Section 1326 continues to disparately impact Mexican and other
Latino defendants.**

Purposeful discrimination offends the Constitution. *Personnel Administrator
of Massachusetts v. Feeney*, 442 U.S. 256, 274 (1979).  Disparate impact can
provide evidence of intent or purposefulness.  Thus, the Supreme Court has said,
"[I]f a neutral law has a disproportionately adverse effect upon a racial minority, it is
unconstitutional under the Equal Protection Clause only if that impact can be traced
to a discriminatory purpose." *Id.* at 272.  In *Arlington Heights*, the Supreme Court
explained:

> The impact of the official action *whether it "bears more heavily on one
> race than another," Washington v. Davis, supra*, 426 U.S., at 242, 96
> S.Ct., at 2049 may provide an important starting point.  Sometimes a
> clear pattern, unexplainable on grounds other than race, emerges from
> the effect of the state action even when the governing legislation
> appears neutral on its face. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct.
> 1064, 30 L.Ed. 220 (1886); *Guinn v. United States*, 238 U.S. 347, 35
> S.Ct. 926, 59 L.Ed. 1340 (1915); *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct.

872, 83 L.Ed. 1281 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339, 81
S.Ct. 125, 5 L.Ed.2d 110 (1960).  The evidentiary inquiry is then
relatively easy. But such cases are rare.  Absent a pattern as stark as that
in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the
Court must look to other evidence.

429 U.S. at 266.[47]  In this case, not only were racism and eugenics a discriminatory

purpose motivating the enactment of the first border crossing laws, such laws

continue to disparately impact Mexican and other Latino defendants.

According to the United States Sentencing Commission, 99.0 percent of

defendants in illegal re-entry cases in fiscal year 2021 were Hispanic.[48]  That figure

is not aberrational, as in fiscal year 2020 Hispanic defendants constituted 99.1

percent of persons prosecuted under the illegal re-entry statute.[49]  Other statistics

suggest that persons who are charged with illegal re-entry are largely comprised of

persons who have crossed the southern border of the United States, which is shared

with Mexico.  In 2000, over 97% of persons apprehended at the border were

---

[47] The other factors identified by the *Arlington Heights* Court have been discussed
above.
[48] United States Sentencing Commission, Quick Facts: Illegal Reentry Offenses,
Fiscal Year 2021, available at Quick Facts on Illegal Reentry Offenses (ussc.gov).
2021 is the last fiscal year for which the Sentencing Commission has released this
information.
[49] United States Sentencing Commission, Quick Facts: Illegal Reentry Offenses,
Fiscal Year 2020, available at https://www.ussc.gov/sites/default/files/pdf/research-
and-publications/quick facts/Illegal_Reentry_FY20.pdf.

Mexican.  In 2005, Mexicans made up 86% of apprehensions, and in 2010, 87%.[50]
In the last decade, Mexicans have made up a smaller percentage of arrestees due to
increased migration from Central America, but combined, the two groups easily
constitute the overwhelming majority of border crossers.[51]

Overall, these disparities are comparable to disparities that have supported
other successful *Arlington Heights* challenges. *See, e.g.*, *Ave. 6E Investments*, 818
F.3d at 497-498 (denial of request for rezoning permit to builder associated with
Hispanic neighborhoods where the proposed site was on the border of a majority
white area and most low-to-moderate-income housing was concentrated in
neighborhoods that were 75% Hispanic); *Arce*, 793 F.3d at 974-978 (legislation
targeted the elimination a school program that was comprised of students who were
90% of Mexican or other Hispanic origin); *The Committee Concerning Community
Improvement v. City of Modesto*, 583 F.3d 690, 696-704 (9th Cir. 2009) (recognizing
a disparate impact on Latino people where the neighborhoods were "trending"

---

[50] Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000-
2019, https://www.cbp.gov/sites/default/files/assets/documents/2020-
Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Appre
hensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29 0.pdf.
[51] U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007-
2019, https://www.cbp.gov/sites/default/files/assets/documents/2020-
Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citize
nship%20and%20Sector%20%28FY2007%20-%20FY%202019%29 1.pdf.

Latino during the relevant period and areas 71% Latino were excluded from municipal services whereas those services were to extended to other areas that were only 48% Latino).

The executive branch continues to wield § 1326 as a tool of mass prosecution that disproportionately affects Mexicans and Latin Americans.  In April 2018, then-Attorney General Jeff Sessions announced a "zero tolerance" policy targeting illegal entry.[52]  The following month, Sessions made clear at an address delivered in San Diego that "the Department of Homeland Security is now referring 100 percent of illegal Southwest Border crossings to the Department of Justice for prosecution. And the Department of Justice will take up those cases."[53]  Both Sessions and Stephen Miller, a senior policy advisor to President Trump and the architect of the zero-tolerance policy,[54] drew inspiration from the discriminatory immigration laws of the

---

[52] *See* "Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry," U.S. Dept. of Justice, Apr. 6, 2018, available at https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry.

[53] "Attorney General Sessions Delivers Remarks discussing the Immigration Enforcement Actions of the Trump Administration," Dept of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[54] *See, e.g.*, Julie Hirshfield Davis & Michael D. Shear, *How Trump to Enforce a Practice of Separating Migrant Families*, N.Y. Times (June 16, 2018), https://www.nytimes.com/2018/06/16/us/politics/family-separation-trump.html?login=smartlock&auth=login-smartlock.

1920s.  In a series of leaked emails, Miller lauded the immigration policies of this

era, suggesting to a journalist, "This would seem a good opportunity to remind

people about the heritage established by Calvin Coolidge, which covers four decades

of the 20th century" – i.e., the decades between the 1924 Act and its repeal in

1965.[55] Likewise, in a 2015 interview with Breitbart, Sessions expressed alarm at the

rising percentage of "non-native born" Americans, noting that when immigration

levels were "about this high in 1924," the President and Congress "changed the

policy, and it slowed down immigration significantly."[56] He warned that repeal of

those policies in 1965 had primed the country for a "surge far past what the situation

was in 1924."[57]

This evidence demonstrates that § 1326 has disparately impacted Mexican and

Latino immigrants and continues to do so today.  Combined with Mr. Rodriguez-

Soto's showing that racial discrimination was a "motivating factor" in its passage, he

has satisfied his initial burden under *Arlington Heights* to demonstrate that the law

---

[55] Katie Rogers & Jason DeParle, *The White Nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.
[56] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan. 10, 2017), https://www.theatlantic.com/poitics/archive/2017/01/jeff-sessions-1924-immigration/512591/.
[57] *Id.*

violates equal protection.

**E.    The burden of proof shifts to the government.**

Because Mr. Rodriguez-Soto has shown both a discriminatory purpose and a disparate impact underlying § 1326, the burden shifts to the government to show that the Undesirable Aliens Act of 1929 would have passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266–68, 270 n. 2; s*ee also Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor").  The Court should thus provide the government an opportunity to make this showing; if it declines to do so, the Court should dismiss the charge.

If, however, the government submits evidence showing that the 1929 law would have been enacted without a discriminatory purpose (or if the Court believes that Mr. Rodriguez-Soto has not yet shown a disparate impact and discriminatory purpose), the Court should schedule an evidentiary hearing.  Courts frequently hold evidentiary hearings and trials to hear evidence on the *Arlington Heights* factors. *See e.g., Hunter*, 471 U.S. at 229 (relying on evidence at trial of state legislative proceedings, "several historical studies, and the testimony of two expert historians"); *Democratic National Committee,* 948 F.3d at 998 (referencing ten-day bench trial); *Arce,* 793 F.3d at 976-977 (reversing district court's grant of summary judgment on

equal protection claim and remanding for trial). Indeed, the Supreme Court has found error where a lower court granted summary judgment "without an evidentiary hearing" on a legislature's disputed motives under *Arlington Heights*. *Hunt*, 526 U.S. at 545. If, at the end of this hearing, the government has not carried its burden to show that the crime of illegal reentry would have been enacted without a racially discriminatory motive, § 1326 is unconstitutional, and the Court must dismiss the charge.

## <u>Conclusion</u>

Because Mr. Rodriguez-Soto has made the requisite showing on the five *Arlington Heights* factors, the Court should find that § 1326 violates the Equal Protection and Due Process Clauses and grant his motion and dismiss the indictment.

WHEREFORE, Mr. Rodriguez-Soto respectfully requests that this motion to dismiss the indictment be granted.

Dated: This 1st day of September, 2022.

Respectfully submitted,

*s/ Kendal D. Silas*
KENDAL D. SILAS
State Bar of Georgia No. 645959
Attorney for
ROBERTO RODRIGUEZ-SOTO

Federal Defender Program, Inc.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, GA 30303; 404/688-7530

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Motion to Dismiss Indictment for Violation of Equal Protection was electronically filed this day with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following:

> Gregory Radics, Esq.
> Assistant United States Attorney
> Northern District of Georgia
> Federal Courthouse, Ste. 600
> 75 Ted Turner Drive, S.W.
> Atlanta, GA 30303

Dated: This 1st day of September, 2022.

s/ *Kendal D. Silas*
KENDAL D. SILAS, Esq.
Attorney for
ROBERTO RODRIGUEZ-SOTO
